MOW SUN WONG et al., Plaintiffs,

v.

Robert E. HAMPTON, Chairman of the United States Civil Service Commission, et al., Defendants.

No. C–70–2730 RFP.

United States District Court, N. D. California.

March 31, 1977.

Edward Steinman, Associate Professor of Law, University of Santa Clara School of Law, Santa Clara, Cal., Patricia Lee, San Francisco Neighborhood Legal Assistance Foundation, San Francisco, Cal., Kenneth Hecht, Employment Law Center, San Francisco, Cal., for plaintiffs Mow Sun Wong, et al.

Robert H. Bork, Sol. Gen., Office of the Sol. Gen., Washington, D. C., Stephen A. Shefler, Asst. U. S. Atty., Civ. Div., San Francisco, Cal., for defendants Robert E. Hampton, et al.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This action was brought by five aliens, lawful permanent residents of the United States, to challenge the validity of a regulation promulgated by the United States Civil Service Commission excluding virtually all noncitizens from eligibility for appointment to the federal civil service.[1] Plaintiffs sought a declaratory judgment that this

1. At issue was the validity of Civil Service Commission Regulations § 338.101, 5 C.F.R. 338.101 (1976).

regulation was in violation of the Due Process Clause of the Fifth Amendment, and injunctive relief to prevent defendants from denying plaintiffs the opportunity to apply for employment in the federal civil service on the basis of alienage.

On August 31, 1971, this court denied plaintiffs' motion for summary judgment, and granted defendants' motion to dismiss. *Mow Sun Wong v. Hampton*, 333 F.Supp. 527 (N.D.Cal.1971). The court held that the challenged civil service regulations were not implicitly repudiated by certain Acts of Congress, and that they did not violate the equal protection considerations inherent in the Due Process Clause of the Fifth Amendment.

The judgment of this court was reversed by the Court of Appeals for the Ninth Circuit on January 25, 1974. *Mow Sun Wong v. Hampton*, 500 F.2d 1031 (9th Cir. 1974). Drawing upon cases recognizing alienage as a "suspect classification" under the Equal Protection Clause of the Fourteenth Amendment, *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and that an indiscriminate prohibition on employment of noncitizens by state governments is violative of equal protection, *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Court of Appeals held that the challenged regulation was in conflict with the Fifth Amendment.

Although recognizing that certain federal governmental interests in regulating the conduct of noncitizens, inapplicable to the states, conceivably supported the Commission's regulation, the Court of Appeals nevertheless held that these were not "compelling governmental interests" capable of supporting discrimination based upon alienage. The Court of Appeals therefore remanded the case to this court with instructions to grant plaintiffs the injunctive relief sought.

The decision of the Court of Appeals invalidating the civil service regulation was affirmed by the Supreme Court on June 1, 1976. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495. The Supreme Court affirmed, however, on grounds distinct from those relied upon by the Court of Appeals. "[A]ssuming without deciding that the national interests identified by the [defendants] would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service," *id.* at 116, 96 S.Ct. at 1911, the Supreme Court nevertheless found the rule as promulgated by the Civil Service Commission to be invalid.

The Court stated that, where the federal government seeks to justify a rule violative of equal protection if adopted by a state, due process requires that there be a legitimate basis for presuming that the rule was motivated by those national interests proffered in support of it. Since the concerns of the Civil Service Commission are limited to the promotion of an "efficient" federal service, an objective inadequate to sustain the Commission's rule, there is no basis upon which to conclude that the rule was intended to serve those national interests which might justify its adoption. The Supreme Court therefore concluded that section 338.101 of the Civil Service Commission Regulations was invalid, and affirmed the judgment of the Court of Appeals.

The case is again before this court, on plaintiffs' motion for an order implementing the mandate of the Supreme Court's June 1, 1976, opinion. Normally, this would present a simple task. Although the Supreme Court did not issue a specific directive, we think it clear under that Court's mandate that plaintiffs are entitled to a judgment declaring section 338.101 of the Civil Service Commission Regulations invalid, and an injunction requiring defendants to admit plaintiffs to competitive examination in the civil service.

Simple execution of the Supreme Court's mandate is, however, foreclosed in the instant case. By Executive Order dated September 2, 1976, President Ford amended Civil Service Rule VII to provide explicitly for exclusion of aliens from the civil service, except in limited circumstances where nec-

essary for efficiency of the service.[2] Thus, subsequent to the decision of the Supreme Court, but prior to plaintiffs' motion for an order implementing the mandate of that Court, the President purported to change the law governing the subject matter at issue in the litigation. The question presently before this court, therefore, is the effect of the President's September 2, 1976, Executive Order upon the relief appropriately ordered by this court pursuant to the Supreme Court opinion of June 1, 1976.

Plaintiffs' entitlement to an order declaring section 338.101 of the Civil Service Commission Regulations invalid is not in dispute. The Executive Order in no way affects the validity of this regulation, and a declaratory judgment holding the regulation unconstitutional is clearly appropriate. See *United States Civil Service Commission v. Ramos,* 426 U.S. 916, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976).

What is at issue is plaintiffs' entitlement to an injunction mandating their admission to competitive examination in the civil service. Noting that the trial court must apply the federal law as it exists when the court enters final judgment subsequent to remand, see *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 178 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1033, 20 L.Ed.2d 1151 (1968), and *Thorpe v. Housing Authority,* 393 U.S. 268, 281–82, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), the government argues that the intervening Executive Order precludes the issuance of an injunction. While conceding that the Executive Order, *if valid,* precludes injunctive relief, plaintiffs premise their entitlement to an injunc-

tion upon the invalidity of the Executive Order. All parties appear to concede that an invalid Executive Order cannot supersede the mandate of the Supreme Court, and therefore that the validity of President Ford's September 2, 1976, order excluding aliens from the civil service is properly placed into controversy in determining the propriety of injunctive relief pursuant to the June 1, 1976, opinion of the Supreme Court. We turn therefore to that issue.

Plaintiffs seek to invalidate Executive Order 11,935 upon two distinct grounds. First, plaintiffs contend that the Order exceeds the scope of the President's statutory and constitutional authority to prescribe qualifications for federal employment. Second, plaintiffs assert that, even if the President is generally authorized by Congress or the Constitution to enact such a rule, the rule must be stricken as repugnant to the Due Process Clause of the Fifth Amendment. We address these issues in turn.

President Ford promulgated Executive Order 11,935, "[b]y virtue of the authority vested in me by the Constitution and statutes of the United States of America, including Sections 3301 and 3302 of Title 5 of the United States Code . . . ."

Pursuant to 5 U.S.C. § 3301, the President is authorized to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service", as well as to, "ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment

---

**2.** Executive Order 11,935, 41 Fed.Reg. 37301 (1976), provides as follows:

By virtue of the authority vested in me by the Constitution and statutes of the United States of America, including Sections 3301 and 3302 of Title 5 of the United States Code, and as President of the United States of America, Civil Service Rule VII (5 CFR Part 7) is hereby amended by adding thereto the following new section:

"Section 7.4 Citizenship.

"(a) No person shall be admitted to competitive examination unless such person is a citizen or national of the United States.

"(b) No person shall be given any appointment in the competitive service unless such person is a citizen or national of the United States.

"(c) The Commission may, as an exception to this rule and to the extent permitted by law, authorize the appointment of aliens to positions in the competitive service when necessary to promote the efficiency of the service in specific cases or for temporary appointments.".

sought".[3] Section 3302 and Title 5 of the United States Code further authorizes the President to make certain exceptions to the rules requiring competition examination.[4] Finally, Article 2 Section 2, Clause 2 of the United States Constitution provides that,

. . . [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Plaintiffs contend that these grants of authority are insufficiently broad to sustain Executive Order 11,935.

■■■ Although we are not unmindful of the difficulties encountered in deriving a statutory basis of authority for issuance of the Executive Order,[5] nor of the complexities inherent in finding constitutional authorization,[6] we think that extended analy-

---

3. 5 U.S.C. § 3301 provides, in its entirety, as follows:

The President may—

(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;

(2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and

(3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.

4. 5 U.S.C. § 3302 provides as follows:

The President may prescribe rules governing the competitive service. The rules shall provide, as nearly as conditions of good administration warrant, for—

(1) necessary exceptions of positions from the competitive service; and

(2) necessary exceptions from the provisions of sections 2951, 3304(a), 3306(a)(1), 3321, 7152, 7153, 7321, and 7322 of this title. Each officer and individual employed in an agency to which the rules apply shall aid in carrying out the rules. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 417.

5. The Supreme Court derived the Civil Service Commission's scope of authority, limited to the promotion of "efficiency" in the civil service, by reference to the statutory language delegating authority to the *President.* See *Hampton v. Mow Sun Wong, supra,* 426 U.S. 114, fn. 47, 96 S.Ct. 1895 and accompanying text. The Court subsequently determined that the Commission's regulation was insufficiently related to legitimate efficiency considerations to sustain the regulation on that basis. *Id.* at 115–116, 96 S.Ct. 1895. This determination is in some tension with the conclusion that the analogous Executive Order is sufficiently related to efficiency to be a valid exercise of the Presidential powers delegated under the statute. See Note, "The Supreme Court, 1975 Term," 90 Harvard L.R. 1, 105–108 (1976).

In order to be a proper exercise of delegated power, an executive order must be rationally related to the statutory grant of authority upon which it is premised or to a grant of power arising from the Constitution itself. See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). It may be that the instant Executive Order (as well as the Commission's regulation), while *rationally* related to the statutory power to promote "efficiency," and thus a valid exercise of delegated authority, is nevertheless insufficiently supportive of this interest to be sustained upon that basis alone against a due process challenge. See page 10 *supra.* Since the Civil Service Commission, unlike the President, could proffer *only* this interest in support of its regulation, the Court found the regulation invalid. It does not, however, necessarily follow that the regulation or the subsequent Executive Order are invalid as an exercise of powers delegated under the relevant *statute.*

6. In general, Congress, pursuant to its power to create inferior federal offices, has the power to prescribe reasonable qualifications for office; while the President, pursuant to his constitutional power of appointment, has the authority to select for appointment from among those designated by Congress as qualified. See *Myers v. United States,* 272 U.S. 52, 128–29, 47 S.Ct. 21, 71 L.Ed. 160 (1926). So long as the qualifications prescribed by Congress do not amount to a "legislative designation" of the appointee, they are within Congress's general scope of authority. *Id.*

Thus, pursuant to its power to set qualifications, Congress may prescribe that an appointee be selected from among those found to be the most qualified by competitive examination. See 13 Ops.Atty.Gen. 516, 524; 5 U.S.C. § 3318(a). Within the class of eligibles, however, the President may exercise his power of appointment. If otherwise constitutional, the President presumably may systematically exercise his discretion to choose citizens rather than noncitizens for appointment.

sis of these issues is unnecessary in view of the fact that the Supreme Court has already decided the question presented.

In its opinion, the Court reviewed in detail the background of Congressional participation in the rule excluding aliens from federal employment. Although the Court determined that Congress had never *mandated* the President or Civil Service Commission to exclude noncitizens from the federal service, it clearly decided that Congress had delegated sufficiently broad authority to permit the President or Civil Service Commission to adopt such a rule in the exercise of their own *discretion*:

> Pursuant to a broad grant of authority comparable, in its generality and in its absence of any reference to a citizenship requirement, to that applicable to the Civil Service Commission, the Postal Service originally imposed such a requirement and then withdrew it. Neither the establishment nor the withdrawal of the requirement was either mandated or questioned by Congress or the President. We have no doubt that the statutory directive which merely requires such regulations "as will best promote the efficiency of [the] Service," as well as the pertinent Executive Order, gives the Civil Service Commission the same discretion that the Postal Service has actually exercised; the Commission may either retain or modify the citizenship requirement without further authorization from Congress or the President. 426 U.S. 112–13, 96 S.Ct. 1909–1910 (footnotes omitted).

We think that the foregoing language necessarily determines that the statutory grant of authority is sufficiently broad to encompass an Executive Order barring noncitizens from the civil service, and is dispositive as to the President's power to promulgate Executive Order 11,935. We therefore turn to the issue expressly reserved by the Supreme Court, whether such an exercise of Presidential power is in conformity with the Due Process Clause of the Fifth Amendment.

In its previous opinion in this case, the Court of Appeals for the Ninth Circuit squarely faced the underlying constitutional question which the Supreme Court has reserved. Applying the "compelling governmental interest" standard, the Court of Appeals held that an indiscriminate prohibition on the employment of aliens by the federal government is contrary to the Due Process Clause of the Fifth Amendment. Normally, we would feel bound to follow the guidance of the circuit court on this issue, and rule accordingly without independent inquiry. We believe, however, that the subsequent opinion of the Supreme Court in the instant case, as well as the Court's ruling in the companion case of *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), so clearly mandate a standard of review distinct from that previously applied by the Ninth Circuit as to compel an independent analysis of the constitutional issue by this court.

An analysis of enactments by the federal government discriminating on the basis of alienage must begin with the proposition that, ". . . the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization." *Mathews v. Diaz, supra,* at 87, 96 S.Ct. at 1895. Whereas a state must show a "compelling governmental interest" to sustain a law discriminating against noncitizens, see e. g., *Sugarman v. Dougall, supra,*

---

Whether the President's power of appointment permits him to exclude aliens from competitive examination, as opposed to systematically choosing noncitizens from among those found qualified by examination, is more problematic. The examination requirement is mandated by Congress, and conceivably *all* those qualified for appointment under 5 U.S.C. § 3318(a) might under some circumstances be noncitizens. Moreover, many appointments are constitutionally vested not in the President alone, but rather in the "Heads of Departments." While the President could direct each of his department heads to exercise their discretion, where available, to select citizens over noncitizens, whether the President may directly exercise the appointment power of department heads by excluding noncitizens from admission to competitive examination altogether poses significant conceptual problems.

judicial review of federal enactments regarding alienage and immigration is "narrow":

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. . . . The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

Thus, a durational residency requirement for welfare benefits, as applied against aliens by the state, may be impermissible, see *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), whereas a similar requirement may be constitutionally imposed by the federal government. *Mathews v. Diaz, supra.*

█ Implicit under the foregoing analysis is the proposition that the federal government need not show a "compelling" interest as a prerequisite to the exercise of its broad power to regulate immigration and naturalization. We disagree with defendants, however, that a rejection of the "compelling governmental interest" test necessarily dictates either that federal enactments directed towards noncitizens are per se valid, or that a mere rational relationship with any conceivable national interest will suffice in the instant case.

The Supreme Court noted that, "[t]he rule enforced by the Commission has its impact on an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared by the remainder of the community." *Hampton v. Mow Sun Wong, supra,* 426 U.S. at 102, 96 S.Ct. at 1905. The Court

characterized the effect of the rule, identical in effect as the Executive Order at issue here, as "a deprivation of an interest in liberty." *Id.* Although it did not explicitly enunciate a standard of review, the Court noted that, "some judicial scrutiny of the deprivation is mandated by the Constitution." *Id.* at 103, 96 S.Ct. at 1905.

It is thus clear that we are confronted in the instant case with a classification quite distinct from those traditionally accorded minimum judicial scrutiny, and found valid if based upon a reasonable or rational basis. Cf. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The Executive Order at issue here deprives "a discrete and insular minority," see *Graham v. Richardson, supra,* 403 U.S. at 372, 91 S.Ct. 1848, of a liberty interest, in such a manner as to be violative of equal protection if done by a state. Although the unique federal interests involved in the regulation of immigration and naturalization accord the federal government considerably broader latitude to legislate regarding noncitizens than that accorded the states, we do not believe that the standard of review in the instant case is identical as that applied to other legislative classifications made by the federal government which invoke none of these concerns.

That a standard of review distinct from traditional minimum scrutiny equal protection analysis is appropriate is evidenced by the Supreme Court's treatment of the *procedural* aspects of this case. Rather than accepting as given the hypothetical national interests proffered by the government in support of the civil service rule barring noncitizens from federal employment, the Court held that, "due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve [the national interests asserted to justify the rule]." *Id.* 426 U.S. at 103, 96 S.Ct. at 1905.

█ In essence, the Court was attempting to ensure that the Commission's regulation was in fact motivated by the particular interests which accord the federal government broader power than that possessed by

the states to discriminate against aliens. Since the invocation of these interests triggers the principle that the courts should defer, in *balancing* those interests against the deprivation involved, to the political branches of government, the Court was anxious to ensure that the national interests asserted were truly implicated, prior to adopting a deferential standard of review.

■ We believe that these principles have a "substantive" as well as "procedural" application. Although the federal government, unlike the states, need not show that the proffered federal interests "outweigh" the deprivation imposed, it must demonstrate that those interests are substantially advanced by the challenged enactment, rather than merely rationally related to it. Only then can the court satisfy itself that the particular federal interests justifying deference to the political branches are genuinely at stake. This is even more important where the court engages in the convention that a rule expressly mandated by the President or Congress may draw support from any national interest proffered by the government to justify it, without any showing that the particular interest actually motivated the rule's adoption. See *Hampton v. Mow Sun Wong, supra* at 103, 96 S.Ct. 1895.

Much the same standard as suggested here was applied by the Supreme Court itself in concluding that "efficiency" constituted an inadequate basis upon which to sustain the Civil Service Commission's regulation, despite the Court's determination that, "arguably . . . administrative convenience may provide a rational basis for the general rule." *Id.* at 114–15, 96 S.Ct. at 1911. The Court noted that, "[a]ny fair balancing of the public interest in avoiding the wholesale deprivation of employment opportunities caused by the Commission's indiscriminate policy, as opposed to what may be nothing more than a hypothetical justification, requires rejection of the argument of administrative convenience in this case." *Id.* at 115–16, 96 S.Ct. at 1911. We think that the Court's conclusion derived largely from its skepticism that an interest which was not substantially furthered by the Commission's rule was actually the factor motivating the rule's adoption, despite the possible existence of a "rational" relation between the interest and the rule.[7]

■ We therefore hold that, when the federal government seeks to sustain a rule discriminating against noncitizens in a manner which would violate equal protection if adopted by a state, it must demonstrate that the rule substantially furthers important federal interests in the regulation of immigration and naturalization. Once such a threshold showing has been made, however, it becomes the province of the President or Congress to determine the propriety of adopting the rule.[8]

The federal government in this case places primary reliance on two national interests to justify the promulgation of Exec-

---

**7.** Although the Supreme Court utilized "balancing" terminology, in view of *Mathews v. Diaz, supra,* we do not believe that the Court meant to suggest that in each case the court is to independently balance the federal interest at stake against the deprivation involved.

**8.** The standard adopted above is also consistent with the Supreme Court's resolution of *Mathews v. Diaz, supra.* In *Diaz,* the Court first determined that important federal interests were substantially furthered by *some* residency requirement for welfare benefits. The issue remaining was whether the particular line drawn by Congress was reasonable. Noting that any line is arbitrary to some degree, the Court determined that it would sustain any line chosen by Congress which was rational.

In the instant case, the primary issue is whether federal interests are substantially furthered by exclusion of aliens from federal employment. Were it determined that federal interests were substantially furthered with respect to *some* types of federal employment, but not others, an issue more analogous to *Diaz* would result. The question would be whether the line drawn by Congress or the President distinguishing between the two types of federal employment was reasonable. Since any line would be somewhat arbitrary, any rational line drawn would be sustained. But this does not obviate the need to determine as a threshold matter that important federal interests are substantially furthered by *some* classification.

utive Order 11,935. Not surprisingly, these are the interests which the Supreme Court assumed would be sufficient to meet a due process challenge:[9]

> We may assume with the petitioners that if Congress or the President had expressly imposed the citizenship requirement, it would be justified by the national interests in providing an incentive for aliens to become naturalized, or possibly even as providing the President with an expendable token for treaty negotiations . .[10]

■ There can be little doubt that the first interest proffered by defendants, the encouragement of naturalization, is one of those governmental interests unique to the federal government, and capable of supporting a degree of federal legislation beyond that permissible to the states. Thus the *quality* of that interest is of a type which might justify the challenged Executive Order.

There is also little question but that the requirement of citizenship as a prerequisite to federal employment provides a significant incentive for those aliens who are in fact eligible for citizenship to become naturalized. That Executive Order 11,935 substantially furthers this national interest does not appear to be in serious dispute.

We therefore conclude that Executive Order 11,935 is constitutional, at least as applied to those noncitizens who are eligible to become naturalized at the time they apply for federal employment.

We note, however, that, due to a durational residency requirement as well as other prerequisites to naturalization, a substantial number of permanent resident aliens are for a significant period of time ineligible for citizenship. As to this class, it cannot be said that the challenged Executive Order is substantially or even rationally related to the national interest in encouraging citizenship. Moreover, a rule which allowed noncitizens to become employed by the federal government pending completion of the residency requirement would doubtless be an even stronger incentive towards citizenship than the present Executive Order, inasmuch as many noncitizens would be impelled to become naturalized in order to continue their federal employment once they became eligible for citizenship. Executive Order 11,935 is thus overbroad if the governmental interest in encouraging naturalization is the only such interest capable of supporting it.

Having concluded that the federal government may permissibly require citizenship among those who are eligible, however, we believe that the breadth of the Executive Order is justified by the government's further interest in the efficiency of the civil service. To require the federal government to extend employment to noncitizens presently ineligible for citizenship, while permitting it to require citizenship once the residency period was completed, would be excessively disruptive to the service, in that significant numbers of alien employees would automatically be termi-

---

9. Plaintiffs contend that there is no reasonable basis upon which to presume that the President was influenced by these particular interests in promulgating Executive Order 11,935, inasmuch as the President's accompanying letter to the Speaker of the House and President of the Senate explaining issuance of the Order does not specifically name these interests. See letter of September 2, 1976, 41 Fed.Reg. 37303. The President stated generally that, "I have concluded that it is in the national interest to preserve the long-standing policy of generally prohibiting the employment of aliens from positions in the competitive service, except where the efficiency of the service or the national interest dictate otherwise in specific cases or circumstances."

In view of the board language used by the President, the fact that the Executive Order was issued in direct response to the Supreme Court's opinion of June 1, 1976, and in view of the Supreme Court's injunction that, ". . . if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption," plaintiffs' contention must fail.

10. The Supreme Court's "assumption" that these interests would be sufficient to satisfy due process was so strong that one court has treated the Supreme Court as actually having decided the issue. See *Ramos v. U. S. Civil Service Commission*, (D.P.R.1977) 430 F.Supp 422.

nated upon their failure, for one reason or another, to become naturalized. The government's interest in a stable federal work force is thus substantially furthered by its uniform rule of citizenship.[11]

We therefore conclude that Executive Order 11,935 is not in conflict with the Due Process Clause of the Fifth Amendment. Accordingly, plaintiffs' motion for an order enjoining defendants to admit plaintiffs to competitive examination in the federal civil service is hereby denied. Plaintiffs' motion for an order declaring Civil Service Commission Regulations section 338.101 to be unconstitutional is hereby granted.

SO ORDERED.

11. Inasmuch as we view Executive Order 11,935 sustainable on other grounds, we do not reach defendants' contention that the Order is alternatively justified by the national interest in obtaining, through treaty negotiations, reciprocal rights for United States citizens abroad.