**MOW SUN WONG et al., Appellants,**

**v.**

**Alan K. CAMPBELL, Director of the Office of Personnel Management \* et al., Appellees.**

No. 77–2649.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 16, 1979.

Decided Sept. 2, 1980.

---

\* This case was originally filed in the U.S. District Court for the Northern District of California in 1970 under the name *Mow Sun Wong v. Hampton*, 333 F.Supp. 527 (N.D.Cal.1971). At that time, Robert E. Hampton was the Chairman of the United States Civil Service Commission and a named defendant therein in his official capacity. On December 28, 1978, the Civil Service Commission was redesignated as the Office of Personnel Management ("OPM"), and the duties and functions of the Chairman transferred to the Director's position at the OPM. 44 Fed.Reg. 1055 (1978). On July 27, 1979, Alan K. Campbell was confirmed as Director of the OPM. 125 Cong.Rec. S10790 (1979).

Edward H. Steinman, Santa Clara, Cal., for appellants.

Bruno A. Ristau, Director, Foreign Litigation Unit, Dept. of Justice, Washington, D. C., for appellees.

Before BARNES, WRIGHT and WALLACE, Circuit Judges.

**BARNES, Senior Circuit Judge:**

This appeal raises two challenges to Executive Order No. 11935, 5 C.F.R. § 7.4 at 14 (1979), *reprinted in* 5 U.S.C. § 3301 at 384 (1976),[1] which prohibits any alien from taking the examination for, or from generally being given an appointment in, the federal competitive civil service.[2] The first question is whether the President was sufficiently empowered to issue the order. The second inquiry is, if the President was authorized to issue Executive Order No. 11935, whether the order is unconstitutional because it violates the due process clause of the fifth amendment.

## I. FACTS

On December 20, 1970, five lawfully resident aliens instituted a class action for declaratory and injunctive relief challenging, *inter alia*, the constitutionality of a regulation promulgated by the Civil Service Commission (the "CSC"), 5 C.F.R. § 338.101 (1979),[3] which required applicants for most positions in the federal competitive civil service to be citizens of or to be persons owing permanent allegiance to the United States of America. The district court upheld the regulation. *Mow Sun Wong v. Hampton*, 333 F.Supp. 527 (N.D.Cal.1971).

On appeal, this court held that aliens were a suspect class and therefore discrimination by the federal government based on

1. Executive Order No. 11935 states in relevant part:

 By virtue of the authority vested in me by the Constitution and statutes of the United States of America, including Sections 3301 and 3302 of Title 5 of the United States Code, and as President of the United States of America, Civil Service Rule VII (5 CFR Part 7) is hereby amended by adding thereto the following new section:
 
 "Section 7.4 Citizenship
 "(a) No person shall be admitted to competitive examination unless such person is a citizen or national of the United States.
 "(b) No person shall be given any appointment in the competitive service unless such person is a citizen or national of the United States.
 "(c) The Commission may, as an exception to this rule and to the extent permitted by law, authorize the appointment of aliens to positions in the competitive service when necessary to promote the efficiency of the

 service in specific cases or for temporary appointments."

2. As stated in 5 C.F.R. § 1.2 (1979), the federal competitive civil service includes:

 . . . (a) All civilian positions in the executive branch of the Government unless specifically excepted therefrom by or pursuant to statute or by the Civil Service Commission . . .; and (b) all positions in the legislative and judicial branches of the Federal Government and in the Government of the District of Columbia which are specifically made subject to the civil service laws by statute.
 
 *See also* 5 U.S.C. §§ 2101 and 2102.

3. Although the Civil Service Commission has been redesignated as the Office of Personnel Management, the pertinent actions taken herein were made by the agency while under its former designation. For convenience, the agency will be referred to by its former name.

alienage was improper unless justified by compelling reasons. *Mow Sun Wong v. Hampton*, 500 F.2d 1031 (9th Cir. 1974). While several reasons were examined and found by this court to be persuasive for a partial ban on alien employment, no logical or sufficient justification was found for the automatic exclusion of the heterogeneous alien population in this country from virtually all federal civil service employment. Thus, 5 C.F.R. § 338.101 was held to be a denial of due process because it was overbroad. *Id.* at 1041.

On certiorari, the Supreme Court affirmed by a vote of 5 to 4 this court's decision as to the unconstitutionality of the regulation but on entirely different grounds. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).[4] The Court held that overriding national interests may justify a citizenship requirement in the federal civil service even though an identical requirement could not properly be enacted by a state in a comparable situation. However, the Court went on to state that:

> Since these [alien] residents were admitted as a result of decisions made by the Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney General of the United States, due process requires that the decision to impose that deprivation of an important liberty [i. e. eligibility for employment in a major sector of the economy] be made either at a comparable level of government or, if it is to be permitted to be made by the Civil Service Commission, that it be justified

by reasons which are properly the concern of that agency. [Footnote omitted.] *Id.* at 116, 96 S.Ct. at 1911. Finding no express mandate from either Congress or the President to the CSC to issue a general prohibition against the employment of aliens in the federal civil service nor any sufficient justification properly within the CSC's concern to justify such a rule, the Court held the regulation invalid.

On September 10, 1976, the named plaintiffs moved in the district court for an injunctive order implementing the Supreme Court's decision. However, on September 2, 1976, President Ford, in response to the Court's opinion in *Mow Sun Wong*, issued Executive Order No. 11935 which again barred aliens from virtually all positions in the federal civil service. The district court found the order to be within the President's statutory authority and not to be in conflict with the due process clause of the fifth amendment. *Mow Sun Wong v. Hampton*, 435 F.Supp. 37 (N.D.Cal.1977). It denied the requested injunctive relief and this appeal ensued.

## II. DISCUSSION

### A. Presidential Authority To Issue The Executive Order

█ President Ford cited both the Constitution and statutory law (*inter alia* 5 U.S.C. §§ 3301 and 3302) as authority for his issuance of Executive Order No. 11935.[5] The district court below subsequently stated that the dispute over the President's power to issue such order had already been

---

4. Two of the five justices in the majority, Justices Brennan and Marshall, concurred but specifically reserved the "equal protection question that would be raised by congressional or Presidential enactment of a bar on employment of aliens by the Federal Government". *Mow Sun Wong, supra*, 426 U.S. at 117, 96 S.Ct. at 1912. Justice Rehnquist, speaking for the four dissenting justices, would find no protected liberty interest in obtaining federal employment and therefore no due process claim against the regulation. *Id.* at 118–21, 96 S.Ct. at 1912–13. For the dissent, the dispositive issue was whether the delegation to the CSC had been properly made. *Id.* at 123, 96 S.Ct. at 1914. Finding it to be so, the dissent criticized the

majority's further scrutiny as an inappropriate interference with the "political" judgments of the executive branch. *Id.* at 126–127, 96 S.Ct. at 1916, *see also* Note, *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 107–108 (1976).

5. As stated by the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952):

> The President's power, if any, to issue . . [an executive] order must stem either from an act of Congress or from the Constitution itself.

decided in the affirmative by the Supreme Court based on Congress' delegation to the President in 5 U.S.C. § 3301(1).[6] *Mow Sun Wong, supra,* 435 F.Supp. at 42; *accord, Vergara v. Hampton,* 581 F.2d 1281, 1284 (7th Cir. 1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979). We agree.[7]

The Supreme Court in *Mow Sun Wong, supra,* 426 U.S. at 112–116, 96 S.Ct. at 1911, did not hold that the promulgation of 5 C.F.R. § 338.101 was per se beyond the delegated authority of the CSC.[8] It was noted by the Court that Congress had empowered the President to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of . . [the federal civil] service." *Id.* at 114 n.47, 96 S.Ct. at 1910, *citing to* 5 U.S.C. § 3301(1). Additionally, Congress had empowered the CSC, "subject to the rules prescribed by the President", to "prescribe regulations for, [and] control, supervise, and preserve the records of, examinations for the competitive service." 5 U.S.C. § 1302(a). Section 2.1(a) of Executive Order No. 10577, previously issued by President Eisenhower, authorized the CSC to "establish standards with re-spect to citizenship" and other requirements "which applicants must meet to be admitted to or rated in [the competitive service] examinations." Executive Order No. 10577 § 2.1(a), 5 C.F.R. § 2.1(a) at 8 (1979), *reprinted in* 5 U.S.C. § 3301 at 373 (1976). 5 C.F.R. § 338.101 was promulgated by the CSC pursuant to that initial delegation from Congress to the President, 5 U.S.C. § 3301(1), and the second delegation from the President to the CSC, 5 U.S.C. § 1302(a) and Executive Order No. 10577.

In *Mow Sun Wong, supra,* 426 U.S. at 113, 96 S.Ct. at 1910, the Supreme Court, in considering the CSC's authority to issue the regulation, stated that it had "no doubt that the statutory directive which merely requires such regulations 'as will best promote the efficiency of [the] Service,' 5 U.S.C. § 3301(1), as well as the pertinent Executive Order, gives the Civil Service Commission the same discretion . . . [to] either retain or modify the citizenship requirement without further authorization from Congress or the President. [Footnote omitted.]" Given the Court's conclusion that the CSC was sufficiently empowered by the delegation from the President to consider and issue a regulation incorporat-

---

**6.** 5 U.S.C. § 3301(1) provides that:

The President may—

(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service . . . .

**7.** In addition to its reference to statutory law, the Government argued in its briefs to this court that the President could also rely on his powers under Article II of the Constitution. Initially citing to Section 1, Clause 1 of Article II, the Government points out that the Constitution vests the "executive Power" in the President. Further, under Article II, Section 2, Clause 2, the President is given the power to nominate officers of the United States, subject to the advice and consent of the Senate, but with the contingency that Congress may by law vest the appointment of inferior officers in the President alone, in the courts, or in the Heads of the Departments. The Government contends that those express constitutional provisions give the President ample authority to set standards and qualifications (including a citizenship requirement) for those who are to be employed by the Executive Branch of the government.

We need not and do not address that argument because of our conclusion as to the scope of the President's authority under 5 U.S.C. § 3301(1). We do however note that the President's appointment power over federal *employees,* if it is provided for at all in the Constitution, differs greatly from his appointment powers over federal *officers,* and is a subject which has not received much attention in either caselaw or commentary. *See generally Corwin's The Constitution and What It Means Today* 177 (14th ed. 1978); Vol. II Schwartz, *A Commentary on the Constitution of the United States, Part I—The Powers of Government: Powers of the President* 46 (1963).

**8.** The Supreme Court did not hold that 5 C.F.R. § 338.101 was beyond the delegated authority of the CSC. *Mow Sun Wong, supra,* 426 U.S. at 113, 96 S.Ct. at 1910. Rather, while recognizing that the CSC had discretion in establishing rules to promote the efficiency of the federal civil service, the Court found that the issuance of the regulation was not justified by any interest properly within the CSC's concern. *Id.* at 114–116, 96 S.Ct. at 1910–1911.

ing a citizenship requirement (if the CSC could justify such a regulation with a legitimate interest properly within its concern), it is clear that the President's authority under 5 U.S.C. § 3301(1) to issue Executive Order No. 11935 can be no less valid since in that order the President is merely exercising the authority that he had previously delegated to the CSC. *Accord, Vergara, supra,* 581 F.2d at 1285.

 Further sources of authority for the President's issuance of Executive Order No. 11935 arise from a number of additional statutory and constitutional provisions. As noted by the Court in striking down the CSC's promulgation of 5 C.F.R. § 338.101:

> That agency has no responsibility for foreign affairs, for treaty negotiations, for establishing immigration quotas or conditions of entry, or for nationalization policies.

*Mow Sun Wong, supra,* 426 U.S. at 114, 96 S.Ct. at 1910. In comparison, however, the President clearly does have considerable responsibility over:

1) foreign affairs, *see generally United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936); *C. & S. Air Lines v. Waterman Corp.,* 333 U.S. 103, 109–110 (1948); *Narenji v. Civiletti,* 617 F.2d 745, 748 (D.C. Cir. 1979), *cert. denied,* ── U.S. ──, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); Corwin, *The President, Office and Powers 1787–1957* 170–226 (4th ed. 1957); Vol. II Schwartz, *A Commentary on the Constitution of the United States, Part I—Powers of the Government: Powers of the President* 96–169 (1963);

2) treaty negotiations, U.S. Const. art. 2, § 2, cl. 2;

3) the admissibility of aliens, 8 U.S.C. § 1182(f); *see also Knauff v. Shaughnessy,* 338 U.S. 537, 542–543, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); and

4) if he decides that it would be in the interest of the United States to do so, the President may impose any conditions on the entry of aliens that he may deem appropriate, 8 U.S.C. § 1182(f).

While we do not necessarily find any one of the foregoing to be sufficient in and of itself, we do find the above statutory and constitutional provisions in combination to be a sufficient source of authority for the president's issuance of the executive order.

In response to the above arguments, appellants contend that when an executive order is issued pursuant to a statutory or constitutional delegation and when that order adversely affects important and sensitive individual rights, the statutory or constitutional authorization must clearly and explicitly empower the President to so limit those rights. The essence of their contention is that where important individual rights are curtailed by a governmental entity which is exercising its authority via a delegation of power from another governmental entity, the authority to curtail such rights must be specifically expressed within the delegation. Hence, the appellants assert that while the President may have been empowered under 5 U.S.C. § 3301(1) to issue regulations for the admission of individuals into the federal civil service, section 3301(1) fails to expressly authorize the President to effect "a deprivation of an interest in liberty", which Executive Order No. 11935 admittedly does according to the majority opinion in *Mow Sun Wong, supra,* 426 U.S. at 102–103, 96 S.Ct. at 1904–1905.

Appellants rely primarily upon two Supreme Court cases. In *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Court held that in absence of specific authorization from either Congress or the President, executive agencies, although given responsibility to establish their own system for controlling the dissemination of classified information, could not fashion security programs whereby persons were deprived of their civilian employment without being accorded the opportunity to challenge effectively the adverse evidence and testimony against them. In *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court held that the broad power of the Secretary of State under a federal statute to issue passports did not authorize him to pass a regulation which limited a citizen's right to travel on

grounds not previously recognized by Congress. It is noted that the Court has reached similar holdings in *Schneider v. Smith*, 390 U.S. 17, 24–27, 88 S.Ct. 682, 686–687, 19 L.Ed.2d 799 (1968); *Peters v. Hobby*, 349 U.S. 331, 345, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955); and *Ex Parte Endo*, 323 U.S. 283, 299–300, 65 S.Ct. 208, 217, 89 L.Ed. 243 (1944).

█ The problem with appellant's "clear authorization" argument is that the Supreme Court in *Mow Sun Wong* concluded that Congress did confer upon the President the power to set citizenship requirements for public employment under the mandate in 5 U.S.C. § 3301(1) to "promote the efficiency" of the federal civil service. 426 U.S. at 113 n.46, 96 S.Ct. at 1910 n.46 and accompanying text. *See* Note, *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 109–110 (1976). Given the Court's conclusion as to the sufficiency of that authorization, we are precluded from reaching a contrary result.[9]

**B. Constitutionality Of Executive Order No. 11935**

The Supreme Court in *Mow Sun Wong*, *supra*, 426 U.S. at 114 and 116–117, 96 S.Ct. at 1911–1912, specifically reserved the question of the constitutionality of a promulgation by the President of a bar on employment of aliens in the federal civil service. However, the Court did articulate a standard of review for cases where the *federal* government establishes a rule which discriminates on the basis of alienage.[10]

Initially the Court noted that "the power [of the federal government] over aliens is of a political character and therefore subject only to narrow judicial review." *Id.* at 101–102 n.21, 96 S.Ct. at 1904; *accord, Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). Nevertheless, the federal power over aliens was found not to be "so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." *Mow Sun Wong, supra*, 426 U.S. at 101, 96 S.Ct. at 1904. The Court stated that:

> When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest.

*Id.* at 103, 96 S.Ct. at 1905.

In his letter of September 2, 1976 to the Speaker of the House of Representatives and to the President of the Senate which he published together with Executive Order No. 11935, *reprinted in* 41 Fed.Reg. 37303–04 (1976), President Ford stated that the executive order was being issued specifically in response to the Supreme Court's decision in *Mow Sun Wong*. From the President's letter, the primary justification for Executive Order No. 11935 appears to be the maintenance of the status quo as to the employment of aliens in the federal civil

---

**9.** Insofar as our holding rests in part on the President's authority to issue the executive order pursuant to his powers over foreign affairs and treaty negotiations, we note that that power arises from the Constitution, rather than from any delegation, and hence the "clear authorization" argument is not applicable. As to the President's authority under 8 U.S.C. § 1182(f), that statute specifically grants the President, where it is in the national interest to do so, the extreme power to prevent the entry of any alien or groups of aliens into this country as well as the lesser power to grant entry to such person or persons with *any* restriction on their entry as he may deem to be appropriate.

**10.** Recent Supreme Court cases have treated classifications by a *state* based on alienage to be "inherently suspect and subject to close judicial scrutiny." *See e. g. Nyquist v. Mauclet*, 432 U.S. 1, 7, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63 (1977); *Examining Board v. Flores de Otero*, 426 U.S. 572, 601–602, 96 S.Ct. 2264, 2280–2281, 49 L.Ed.2d 65 (1976). In comparison, the Court has applied a more relaxed scrutiny in cases involving *federal* classifications based on alienage. *See Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); *Nyquist, supra*, 432 U.S. at 7 n.8, 97 S.Ct. at 2124 n.8.

service.[11] The Government in its arguments to this court also places reliance on two additional "national interests" which were cited by the Court in its opinion in *Mow Sun Wong* as possible justifications for such a regulation by Congress or the President: *i. e.* 1) to provide an incentive for aliens to qualify for naturalization and thereby participate more effectively in our society, and 2) to help facilitate the President's negotiation of treaties with foreign powers by enabling him to offer employment opportunities for citizens of a given foreign country in exchange for reciprocal concessions. 426 U.S. at 105, 96 S.Ct. at 1906.[12]

■ Applying the standard established in *Mow Sun Wong*, the issue becomes whether any of the three national interests which are identified as justifications for the executive order are interests on which the President may properly rely in making his decision implicating the constitutional and social values at stake in this litigation. To put the inquiry more precisely: is it properly the concern of the President to seek to 1) maintain the status quo in regards to the exclusion of aliens from employment in the federal civil service, 2) encourage naturalization by aliens in this country, or 3) create an expendable token which would help facilitate possible treaties with foreign countries which call for reciprocal employment

concessions; and, if so, do any of those justifications constitute a sufficiently legitimate overriding national interest?

The district court below found the second proffered federal interest (providing an incentive for aliens to be nationalized) to be a sufficient reason to justify Executive Order No. 11935 and to uphold its constitutionality. We agree for reasons stated by the district court in its opinion. 435 F.Supp. at 45–46. *Accord, Vergara, supra,* 581 F.2d at 1287; *cf., Ramos v. U. S. Civil Service Commission,* 430 F.Supp. 422, 424 (D.P.R.1977).[13] We also find that that federal interest is properly the concern of the President (as well as Congress) because: 1) aliens are admitted into this country "as a result of decisions made by Congress and the President", *Mow Sun Wong, supra,* 426 U.S. at 116, 96 S.Ct. at 1911; 2) Congress has empowered the President to "impose on the entry of aliens any restrictions he may deem to be appropriate" if he finds the entry of any aliens or class of aliens to be detrimental to the interests of the United States, 8 U.S.C. § 1182(f); and 3) the foreign affairs powers of the President are interwoven with the general policy of the federal government towards aliens, *cf., Mathews, supra,* 426 U.S. at 81, 96 S.Ct. at 1892; *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952).

11. The President explained his reasons for issuing the order as follows:

 In its decision [in *Mow Sun Wong*], the Court stated that either the Congress or the President might issue a broad prohibition against the employment of aliens in the civil service, but held that neither the Congress nor the President had mandated the general prohibition contained in the regulations of the Commission.

 I have concluded that it is in the national interest to preserve the long-standing policy of generally prohibiting the employment of aliens from positions in the competitive service . . .. It is also my judgment that it would be detrimental to the efficiency of the civil service, as well as contrary to the national interest, precipitously to employ aliens in the competitive service without an appropriate determination that it is in the national interest to do so.

41 Fed.Reg. 37303 (1976).

12. The Court in *Mow Sun Wong, supra,* 426 U.S. at 103, 96 S.Ct. at 1905, indicated that when Congress or the President promulgates a rule in this area, the Court would accept any suggested interest that might rationally be served by the rule as one that the rule was intended to promote. That approach has been accepted and followed by this circuit in *Yassini v. Crosland,* 618 F.2d 1356, 1362 (9th Cir. 1980). In this case, we accept for consideration the Government's proffered justifications as interests which might rationally be served by Executive Order No. 11935.

13. Given our conclusion above that Executive Order No. 11935 is sustainable on the aforementioned ground, we need not and do not reach the issues of the sufficiency of the other two proffered federal interests (*i. e.* the maintenance of the status quo and providing an expendable token for treaty negotiation purposes).

Having found Executive Order No. 11935 to be within the President's authority and not to be in violation of the due process clause of the fifth amendment, we affirm the decision of the district court below.