**Veronica YUEN, Plaintiff,**

v.

**INTERNAL REVENUE SERVICE et al., Defendants.**

No. 80 Civ. 3177.

United States District Court,
S. D. New York.

Aug. 27, 1980.

---

Stephen Gleit, New York City, for plaintiff.

John S. Martin, Jr., U. S. Atty., for the Southern District of New York, Steven E. Obus, Asst. U. S. Atty., New York City, for defendants.

## OPINION

SAND, District Judge.

Plaintiff is a permanent resident alien who claims that she sought and was unlawfully denied federal employment solely on account of her alienage.[1] Plaintiff first contends that she "owes allegiance" to the United States [2] and is therefore eligible for

---

1. Plaintiff is apparently a citizen of China who came to this country as a student in 1970. (Yuen Aff. p. 8). Her assertion that she is a lawful permanent resident alien is not contested by the defendants. (Yuen Aff. p. 6). The position for which plaintiff applied is an excepted, i. e., non–Civil Service position. *See* discussion, *infra*. Positions in the competitive Civil Service are generally limited to citizens or "nationals" of the United States. Exec. Order No. 11,935, 5 C.F.R. § 7.4 (1974). *See also, Jalil v. Campbell*, 590 F.2d 1120 (D.C.Cir.1978);

*Vergara v. Hampton*, 581 F.2d 1281 (7th Cir. 1978), *cert. denied* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979); *Mow Sun Wong v. Hampton*, 435 F.Supp. 37 (N.D.Calif.1977); *Ramos v. Civil Service Commission*, 430 F.Supp. 422 (D.P.R.1977) (3 Judge Court).

2. Plaintiff's claim that she "owes allegiance" to the United States is based solely on her execution, on June 10, 1980, of the following affidavit:

I, VERONICA YUEN, do solemnly swear (or affirm) that I will support defend the

federal employment under 31 U.S.C. § 699b (Supp.1980), (referred to hereinafter as the "appropriation act" or "§ 699b"), which, with certain exceptions, effectively limits federal employment opportunities to citizens, aliens from specifically enumerated countries, and those who "owe allegiance" to the United States.[3] Alternatively, if her status is construed as not falling within the express terms of that statute, plaintiff argues that the "distinction made by the statute between alien[s] eligible to work and receive compensation and those alien[s] not eligible to work and receive compensation is unconstitutional and deprives plaintiff of equal protection of the law." (Plaintiff's Memorandum of Law In Support of Issuance of Preliminary Injunction at 2).

At a hearing held on June 10, 1980, plaintiff's application for preliminary injunctive relief was denied.[4] Since there are no disputed issues of material fact, the parties have agreed to present the case to the Court for disposition on the merits on stipulated facts.[5] After considering a series of briefs submitted by each side,[6] the Court

---

Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same. So help me God.

3. The statute, which limits the class of persons who can be compensated from funds appropriated by Congress and which is entitled "Citizenship requirement for federal employees compensated from appropriated funds" provides that:

"Unless otherwise specified during the current fiscal year no part of any appropriation shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in continental United States unless such person (1) is a citizen of the United States, (2) is a person in the service of the United States on September 29, 1979, who, being eligible for citizenship, has filed a declaration of intention to become a citizen of the United States prior to such date and is actually residing in the United States, (3) is a person who owes allegiance to the United States, (4) is an alien from Cuba, Poland, South Vietnam, or the Baltic countries lawfully admitted to the United States for permanent residence, or (5) South Vietnamese, Cambodian and Laotian refugees paroled into the United States between January 1, 1975, and September 29, 1979; *Provided*, That for the purpose of this section, an affidavit signed by any such person shall be considered prima facie evidence that the requirements of this section with respect to his status have been complied with; *Provided further*, That any person making a false affidavit shall be guilty of a felony, and, upon conviction, shall be fined not more than $4,000 or imprisoned for not more than one year, or both; *Provided further*, That the above penal-clause shall be in addition to, and not in substitution for any other provisions of existing law; *Provided further*, That any payment made to any officer or employee contrary to the provisions of this section shall be recoverable in action by the Federal Government. This section shall not apply to citizens of Israel, the Republic of the Philippines or to nationals of those countries allied with the United States in the current defense effort, or to temporary employment of translators, or to temporary employment in the field service (not to exceed sixty days) as a result of emergencies." 31 U.S.C. § 699b.

Section 699b is from the Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub.L.No.96-74, 93 Stat. 559, 574 (1979). Similar appropriation acts have been enacted annually since at least 1938. *See e. g.,* Treasury and Post Office Department Appropriations Act for 1939, Pub.L.No.75-453, 52 Stat. 120, 148 (1938).

4. Plaintiff commenced this action by complaint dated June 4, 1980, alleging that the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 and the Fifth Amendment to the United States Constitution. Simultaneously with the filing of the complaint plaintiff sought a preliminary injunction to prohibit defendants from hiring any person other than herself for the position in question.

Although the hearing on June 10, 1980 was not transcribed, the Court summarized its reasons for denying plaintiff's application at a subsequent hearing on June 16, 1980. *See* Transcript of June 16, 1980 Hearing (hereinafter "Trans.") at 4-6.

5. The parties also agreed that plaintiff's affidavit in support of her application for a preliminary injunction ("Yuen Aff."), together with the opposing affidavit of Robert Walker, Chief, Personnel Branch, North Atlantic Region, Internal Revenue Service ("Walker Aff."), would constitute the agreed statement of facts.

6. In addition to the briefs submitted in connection with plaintiff's application for a preliminary injunction, supplemental memoranda of law were served and filed prior to the hearing on June 16, 1980. At that time, the Court requested further briefing on specific questions, *see* Trans. at 8-13, and final briefs were submitted on July 8, 1980.

finds that plaintiff is not eligible for federal employment under the appropriation act and that the statute does not deprive her of equal protection of the law. Accordingly, summary judgment is granted in favor of the defendants and the complaint is dismissed.

### I. The Factual Background

On April 6, 1980, plaintiff, a second year law student, applied for a position as a Legal Research Assistant with the New York City Appeals Office of the Internal Revenue Service ("IRS"). (Yuen Aff. p. 2). Plaintiff disclosed her alien status both in her employment application (Standard Form 171) and at her employment interview. (Yuen Aff. pp. 6, 8). Apparently, the job description for the position she sought "did not require United States citizenship as a condition of employment." (Yuen Aff. p. 7).[7]

On May 29, 1980, John Imbesi, Associate Chief, New York City Appeals Office, telephoned Ms. Yuen and offered her a position as a Legal Research Assistant commencing on June 2, 1980. (Walker Aff. p. 4). Plaintiff was to work "full time" during the summer and "part–time during the academic year." (Yuen Aff. p. 10). After obtaining a release from a prior employment commitment of which defendants were apparently aware (Yuen Aff. pp. 3, 4), Ms. Yuen telephoned Imbesi later in the day on May 29, 1980 and accepted the position. (Walker Aff. p. 5; Yuen Aff. p. 2). That same day, after "discovering" that Yuen was not a

United States citizen, Imbesi contacted IRS Personnel Specialist Carole Butler, who immediately rescinded the offer.[8] (Walker Aff. pp. 6, 7). Although the interval of time between the offer of employment and its withdrawal was thus no more than several hours, it was long enough for plaintiff to have obtained a release from her prior employment commitment. Plaintiff maintains that she still desires a Legal Research Assistant's position with the IRS. (Yuen Aff. p. 9).

### II. The Statutory Issue

#### A. Preliminary Considerations

Plaintiff contends that an oath of allegiance which she executed in affidavit form on June 10, 1980 makes her eligible for federal employment under the "owes allegiance" provision of § 699b(5).[9] Plaintiff also points specifically to the clause in that statute which provides that "for the purpose of this section, an affidavit signed by any such person shall· be considered prima facie evidence that the requirements of this section with respect to his status have been complied with . . . ." Id. On the other hand, the government contends that Congress' intent when it first enacted the "owes allegiance" provision in 1938 was to exempt non–citizen "nationals", i. e., inhabitants of United States possessions such as Puerto Rico or the Philippines, from a newly imposed citizenship requirement,[10] rather than to open federal employment to any alien willing to take an oath. The govern-

---

**7.** According to the IRS, Internal Revenue Manual 13 G 107 (April 7, 1978) contains guidelines to be followed in hiring law students as part time Legal Research Assistants. (Walker Aff. p. 2).

**8.** Butler attempted to reach Yuen by telephone late in the afternoon of May 29, 1980. Although she did not reach Yuen directly, Butler left a message to the effect that "United States citizenship was required and that she [Yuen] should not report for work on June 2, 1980." (Walker Aff. p. 7).

We note that the IRS asserts that "[t]he action of the North–Atlantic Region, Internal Revenue Service in rescinding the oral offer of appointment made to Yuen was based upon the legal proscription against utilizing appropriated

funds to pay non-citizens." (Walker Aff. p. 8) (emphasis added.) It is clear from defendant's subsequent assertions, however, both at oral argument and in various briefs, that IRS's actual position is that the offer was rescinded because plaintiff is not encompassed within any of the categories of eligible employees contained in the appropriation act. See note 3, supra.

**9.** See notes 2 and 3, supra.

**10.** See discussion infra. A citizenship requirement had long been imposed by the Civil Service Commission. See Hampton v. Mow Sun Wong, 426 U.S. 88, 105, 110–111, 96 S.Ct. 1895, 1906, 1908–1909, 48 L.Ed.2d 495 (1976).

ment claims that at the present time, the only non–citizens who owe allegiance to the United States in the sense that that phrase is used in the statute are inhabitants of American Samoa. Before reaching these primary statutory contentions, there are two preliminary matters which must first be addressed: the first relates to the timing of plaintiff's oath of allegiance; the second concerns plaintiff's contention that the statutory issue in this case has already been resolved by the United States Supreme Court's decision in *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (*Hampton I.*)

 Plaintiff applied for federal employment on April 6, 1980 and was offered, accepted and ultimately denied a Legal Research Assistant's position on May 29, 1980. Since her oath of allegiance, on which she relies exclusively to establish her statutory claim,[11] was executed on June 10, 1980, Ms. Yuen apparently did not "owe allegiance" to the United States in the sense that she uses the phrase either at the time of her application or at the time the offer was made, accepted, and withdrawn. It is thus arguable, although the government has not raised this issue, that plaintiff's *statutory* claim is non–justiciable because she could not prevail even if her interpretation of the statute is correct.

While the Court has raised this question on its own initiative, we decline to reach such a result. Despite IRS's assertion that it "stands ready" to hire plaintiff if she should prevail in this litigation (Walker Aff. p. 9; Trans. at 15), the Service has persisted in its refusal to hire Ms. Yuen even after her execution of an oath of allegiance. Obviously, the government disputes plaintiff's interpretation of the statutory phrase "owes allegiance"; just as obviously, Ms. Yuen, as a result of that dispute, is being denied a position which would otherwise be hers. We turn next to plaintiff's argument concerning the significance of *Hampton I* to the statutory issue in this case.

In *Hampton I*, the Supreme Court held that a Civil Service Commission ("CSC") regulation which excluded all aliens from competitive Civil Service employment [12] and which was not mandated by either Congress or the President deprived aliens of liberty without due process of law.[13] Addressing

---

**11.** Plaintiff puts forth no other ground on which to base her claim of allegiance. Moreover, it is clear that neither the duration nor the nature of her residence in the United States will satisfy the "owes allegiance" requirement. *See Oliver v. United States Department of Justice, Immigration and Naturalization Service*, 517 F.2d 426 (2d Cir. 1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 789, 46 L.Ed.2d 646 (1976).

**12.** The CSC regulation at issue in *Hampton I*, 5 C.F.R. § 338.101 (1976), provided in pertinent part:

"(a) A person may be admitted to competitive examination only if he is a citizen of or owes permanent allegiance to the United States.

"(b) A person may be given appointment only if he is a citizen of or owes permanent allegiance to the United States. However, a noncitizen may be given (1) a limited executive assignment under section 305.509 of this chapter in the absence of qualified citizens or (2) an appointment in rare cases under section 316.601 of this chapter, unless the appointment is prohibited by statute."

Under the CSC's interpretation of the regulation, except for the specific exceptions under § 338.101(b)(1) and (2), only citizens and residents of American Samoa were qualified. *See Hampton I*, at 90 n. 1, 96 S.Ct. at 1899.

**13.** The Court first assumed "without deciding that the national interests identified by the . . . [government] would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service." 426 U.S. at 116, 96 S.Ct. at 1911. It then concluded, however, that because the "only concern of the [CSC] is the promotion of an efficient federal service . . . .," the Commission, unlike Congress or the President, *see* discussion *infra*, could put forth no interest other than efficiency in support of a citizenship requirement. *Id.* at 114 115, 96 S.Ct. at 1910. Since the Court found no evidence that the regulation at issue resulted from a "considered evaluation of the relative desirability [from the standpoint of efficiency] of a simple exclusionary rule on the one hand, or the value to the service of enlarging the pool of eligible employees on the other," it held that the CSC's efficiency interest could not support the rule. *Id.* Finally, the Court noted that

"[a]ny fair balancing of the public interest in avoiding the wholesale deprivation of employment opportunities caused by the Commission's indiscriminate policy, as opposed

the question whether the CSC regulation at issue was mandated by Congress, the Court examined, *inter alia*, the citizenship requirements contained in Appropriation Acts similar to the one currently before us.[14] *Id.* 426 U.S. at 108–109, 96 S.Ct. at 1907–1908. The Court found that

> ". . . Congress has consistently authorized payment to a much broader class of potential employees than the narrow category of citizens and natives of American Samoa eligible under the Commission rule. Congress has regularly provided for compensation of any federal employee owing allegiance to the United States. Since it is settled that aliens may take an appropriate oath of allegiance, the statutory category, though not precisely defined, is plainly more flexible and expansive than the Commission rule." *Id.* at 109, 96 S.Ct. at 1908. (Footnote omitted).

Plaintiff relies on this passage from *Hampton I* to argue that "the Supreme Court necessarily decided that the phrase 'a person who owes allegiance to the United States' in the appropriations act may include an alien" and that the principles of *stare decisis* bar a reconsideration of that issue by this Court. (Plaintiff's Response To Defendant's Memorandum of Law at 6; Plaintiff's Further Memorandum of Law at 5–7). The government characterizes this portion of *Hampton I* as "dictum" and contends that in *Hampton I* the Court "was not squarely presented with any issue requiring interpretation of the 'owes allegiance' provision of any federal appropriations act." (Memorandum of Law In Opposition to Plaintiff's Motion For A Preliminary Injunction at 15; Defendants' Supplemental Memorandum at 16–17).

Plaintiff's contention is not without initial appeal. Although the Court's suggestion that aliens are eligible for employment under the appropriations acts because they can take an oath of allegiance is technically dictum, *Hampton I* referred specifically to the "owes allegiance" provision and its impact on aliens to support its conclusion that the class eligible under those acts is more expansive than the class eligible under the CSC rule. This conclusion, moreover, was central to the Court's finding that the rule was not mandated by Congress, which was in turn central to the Court's holding that the rule violated due process. Nevertheless, we reject the contention that *Hampton I* "necessarily decided" the meaning of "owes allegiance" in this context, and conclude that *Hampton I* does not foreclose an analysis of that question by this Court.

As the government correctly points out, the *Hampton I* Court was not "squarely presented" with any issue requiring interpretation of the "owes allegiance" provision. The passage relied on by plaintiff was undoubtedly an important "building block" in the Court's reasoning, but the essential part of that passage is the finding that:

> ". . . Congress has consistently authorized payment to a much broader class of potential employees than the narrow category of citizens and natives of American Samoa eligible under the Commission rule."

426 U.S. at 109, 96 S.Ct. at 1908.

The Court's passing reference to the apparent plain meaning of the "owes allegiance" provision,[15], however, was not essential to the conclusion that the CSC rule was not mandated by Congress. Even if an oath alone cannot qualify aliens for federal employment under the appropriation acts, "the

---

to what may be nothing more than a hypothetical justification, requires rejection of the argument of administrative convenience in this case." *Id.* at 115–116, 96 S.Ct. at 1911. (Footnote omitted).

**14.** *See* note 3, *supra.*

**15.** Although the Court made some references to the legislative history of the appropriation acts, *see* 426 U.S. at 108, 96 S.Ct. at 1907, no

detailed analysis of the purposes and origins of either the "owes allegiance" provision or the affidavit provision, *see* text accompanying notes 9–10 *supra*, appears to have been undertaken by the Court or the parties. *See* the following briefs in *Hampton I*: Brief For the Petitioners at 83–84; Brief For the Respondents; Reply Brief For the Petitioners.

statutory category . . . is [still] plainly more flexible and expansive than the Commission rule."[16] Finally, to conclude that Congress meant something other than an oath of allegiance when it used the phrase "owes allegiance" is not to deny that "aliens may take an appropriate oath of allegiance . . . ." *Id.*, citing *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973).

We thus proceed with our analysis of the language and legislative history of the relevant appropriation acts.

### B. *The Statutory Language*

On its face, § 699b appears to support plaintiff's position. Plaintiff has signed an affidavit stating that she "will bear true faith and allegiance to" the Constitution of the United States.[17] Since the statute provides that "an affidavit signed by [a person seeking federal employment] . . . shall be considered prima facie evidence that the requirements of this section with respect to [her] status have been complied with; . . . ," the burden would appear to be on the government to prove that plaintiff's affidavit is false. Obviously, this argument assumes that an oath can satisfy the "owes allegiance" requirement. Although we ultimately conclude that the legislative history compels a contrary conclusion, there are difficulties with such an assumption that are apparent from the face of the statute.

"Allegiance" generally denotes loyalty to a nation, sovereign or cause.[18] It is impossible, however, to assign meaning to a particular use of the term without understanding how such loyalty must be proven in the circumstances to which that usage applies. *See Oliver v. United States Department of Justice*, 517 F.2d 426, 427 (2d Cir. 1975) ("the concept of owing allegiance for purposes of nationality is not so easily . . . understood"), citing Koessler, "'Subject,' 'Citizen', 'National' and 'Permanent Allegiance,'" 56 Yale L.J. 58, 67–69 (1946).[19] Unfortunately, the language of § 699b provides no guidance as to how Congress intended to define "allegiance" or as to how a person seeking federal employment could prove that he or she owed allegiance to the United States. Plaintiff, of course, contends that an oath is sufficient.

The government urges that an acceptance of plaintiff's contention would render meaningless the appropriation act's specific exceptions for aliens from the enumerated countries.

"[H]aving categorized in great detail the circumstances under which persons of various nationalities would be exempt from the statute, it defies logic to suggest that Congress intended these distinctions to be obliterated by the expedient of an individual's taking an oath of allegiance which might, in any event, be required of employees qualifying under other subsections of the statute."[20] (Memorandum of Law In Opposition To Plaintiff's Motion For A Preliminary Injunction at 17).

---

**16.** *Compare* 31 U.S.C. § 699b (note 3 *supra*) *with* 5 C.F.R. § 338.101 (note 12 *supra*).

**17.** *See* footnote 2 *supra*.

**18.** Webster's New Twentieth Century Dictionary (2d Ed. 1970) defines allegiance as follows:
 1. the relationship of a vassal to his feudal lord.
 2. the tie or obligation of a citizen or subject to his government or ruler; the duty of fidelity to one's ruler, government, or country. Natural or implied *allegiance* arises from the connection of a person with the society in which he is born, and from his duty to be a faithful citizen, independent of any express promise.

 3. loyalty and devotion in general, as to a church, a political party, a principle, a leader.

**19.** In its original feudal setting, "allegiance" denoted a reciprocal correlation of interconnected rights and duties between those in authority and those who relied on that authority for their protection. *See* Koessler, *supra*, who argues that to the extent the obligations of a citizen or national of a modern state are seen as unconditional rather than contingent upon a state's compliance with corresponding duties, the term "allegiance" has become archaic.

**20.** The government has advised the Court that federal employees are required to take an oath of allegiance only when required by specific statute or regulation.

Plaintiff argues that acceptance of her interpretation of the statute would not undermine these statutory exemptions, because aliens from the enumerated countries will be immune from the allegiance requirement while other aliens will be required to take an oath. "Congress may also have specially exempted certain classes of aliens . . . for the specific purpose of permitting them to work for the government without having formally to declare their allegiance to the United States, which is otherwise required by status or declaration." (Plaintiff's Further Memorandum of Law at 18).[21]

While plaintiff's argument is not without merit, we are not convinced that Congress, by exempting specified aliens from a general citizenship requirement for federal employment, intended only to relieve such aliens from the burden of satisfying the "owes allegiance" provision by taking an oath. The statute as a whole suggests that Congress intended to restrict federal employment to persons with a clearly demonstrable affinity to the United States, i. e., citizenship, "allegiance" or, under some circumstances, an intent to become a citizen, and to specified groups of aliens upon whom the benefit of eligibility for such employment is for one reason or another bestowed.[22] Plaintiff's interpretation of the "owes allegiance" provision would open

federal employment to aliens not from the enumerated countries whose claim of allegiance is based on an arguably minimal demonstration of affinity to the United States. Moreover, under § 699b(2), persons currently in the "service"[23] of the United States who are eligible for citizenship must file a "declaration of intention to become a citizen" before they are eligible for federal employment. If plaintiff's interpretation of the statute is correct, Congress has effectively made federal employment more easily obtainable by aliens not included under any statutory exemption other than § 699b(3) than it is by aliens covered under § 699b(2).

In sum, the Court concludes that despite the apparent plain meaning of the statute, it would be inappropriate if not impossible to attempt to divine what Congress meant by "owes allegiance" without examining the relevant legislative history.

### C. The Legislative History

Congress first adopted the appropriation act's restriction on federal employment in two acts passed in 1938.[24] During the House debate on the two appropriation bills,[25] an amendment restricting federal employment to citizens of the United States

21. Plaintiff goes on to argue that: "In the specific case of Filipinos, for example, under the Tydings–McDuffie Act of March 24, 1934, [Pub. L.No. 73 127, 48 Stat. 456 (1934)] the allegiance of Filipinos was to be transferred to the new republic upon the day of independence from the United States. It would have been unduly harsh and contradictory to force a class of people, by statute, to change their allegiance and at the same time, take away their jobs or opportunities for employment, solely because of the transfer of allegiance. In the more general case of refugees, typically aliens fleeing a communist government or a communist takeover (e. g., Cuba, Vietnam and Cambodia), the usual hope was that these people would return to their native countries at a future date. To declare their allegiance to the United States would jeopardize their relationship to their native countries. Congress, thus, may have set up two classes of aliens who are eligible for federal employment: one class which must formally declare allegiance to the United States and one class which need not." Plaintiff's Fur-

ther Memorandum of Law at 18 19 (footnotes omitted).

22. Aside from temporary employees, exempted aliens are all either from countries under communist control or from countries with a close defense relationship with the United States. *See* discussion, *infra*.

23. Although the question is not before us, the legislative history of the citizenship requirement and its exceptions clearly suggest that in the "service" of the United States refers to service in the armed forces. *See* 83 Cong.Rec. 2531–2532 (remarks of Senator Hayden).

24. Independent Offices Appropriation Act, 1939, Pub.L.No. 75–534, 52 Stat. 410, 435 (1938); Treasury and Post Office Department Appropriation Act for 1939, Pub.L.No. 75–453, 52 Stat. 120, 148 (1938).

25. *See* H.R.8837 and H.R.8947, 75th Cong., 3d Sess. (1938).

was offered by Congressman Starnes.[26] The purpose of the amendment, according to Congressman Starnes, was to "protect the integrity of the National Budget and to give preferred employment to American citizens . . . ."

"At a time when millions of American citizens are unemployed and unemployment is increasing daily it is high time we weed out of our governmental agencies every employee who is not a citizen of the United States. When American taxpayers are taxed for the support of our regular governmental agencies and institutions certainly American citizens should be employed to administer these agencies and to receive the compensation raised by such taxes. Unquestionably hundreds of millions of dollars have been spent in the past 5 years in giving employment to people who were not American citizens even though we had millions of American citizens out of employment. This practice must stop. I urge the adoption of my amendment."

83 Cong. 357 (1938). *See also* 83 Cong. Rec. 713 (1938); *Hampton I*, 426 U.S. at 108, 96 S.Ct. at 1907.

Although both bills passed the House without further debate, the Senate subsequently added the "owes allegiance" provision.[27]

The Senate debate surrounding the adoption of this provision demonstrates that it was intended to protect Filipinos employed by the government. In 1938, the Philippine Islands were still a part of the United States, and Filipinos occupied the status of non–citizen "nationals". *See Rabang v. Boyd*, 353 U.S. 427, 429, 77 S.Ct. 985, 986, 1 L.Ed.2d 956 (1957).[28] Apparently, Filipinos had been permitted to take Civil Service examinations since 1903. 83 Cong.Rec. 2532 (1938) (remarks of Senator Hayden). By 1938, a substantial number of Filipinos had long been employed by the federal government, and the concern was that they would be "automatically thrown out" as a result of the newly adopted citizenship requirement. Id. at 2532. *See also* 83 Cong.Rec. 2424 (1938). Senator Glass, who introduced the amendment which contained the "owes allegiance" provision to the first of the two House appropriation bills, specifically stated that its purpose was to immunize such employees from the citizenship requirement.

Mr. GLASS. Mr. President, the purpose of the amendment is to protect several thousand people in the United States who are now employed by the Government and who have not had an opportunity to take out citizenship papers.

Mr. NORRIS. In other words, it limits the section; it takes out of the class mentioned those who are included in the amendment?

Mr. GLASS. It exempts that class.

Mr. NORRIS. I have no objection.

Mr. McKELLAR. Mr. President, as I understand, those to whom it would apply are mostly Filipinos who have been in this country for a number of years.

Mr. GLASS. Yes.

Id.[29]

---

**26.** The full text of the amendment to H.R.8837, which was identical in substance to the amendment to H.R.8947, provided that: "No part of any appropriation contained in this act or authorized hereby to be expended shall be used to pay the compensation of any officer or employee of the Government of the United States or of any agency, the majority of the stock of which is owned by the Government of the United States, whose post of duty is in continental United States, unless such person is a citizen of the United States." 83 Cong.Rec. 357 (1938). *See also*, 83 Cong.Rec. 713 (1938).

**27.** Immediately following the amendment quoted in note 26 *supra*, the Senate added the clause: "or a person owing allegiance to the United States, or who is now in the service of the United States." 83 Cong.Rec. 2424, 2532 (1938).

**28.** The term "national" was apparently not statutorily defined until Congress passed the Nationality Act of 1940, Pub.L.No. 76–853, 54 Stat. 1137 (1940). *See* discussion, *infra*.

**29.** While plaintiff attaches great significance to the words "mostly Filipinos," *see* Plaintiff's Further Memorandum of Law at 13, the Court sees this portion of the colloquy as nothing more than a recognition that inhabitants of American territorial possessions other than the Philippine Islands were in similar position. *See* discussion *infra*.

**1032**

The use in this context of the phrase "owes allegiance to the United States" is not surprising. Only four years earlier, Congress had enacted the Tydings–McDuffie Act of 1934, Pub.L.No. 73–127, 48 Stat. 456 (1934), which established a timetable for the transition of the Philippine Islands from a United States possession to an independent nation.[30] Section 2(a)(1) of that Act provided that until such time as independence was proclaimed by the President, "[a]ll citizens of the Philippine Islands shall *owe allegiance* to the United States." (Emphasis added). The "owes allegiance" provision was thus a particularly appropriate means for describing the relationship between Filipinos and the United States, as Senator Hayden, who introduced the amendment to the second of the two House appropriation bills, was apparently aware:

> Mr. Hayden. . . . the words "or a person owing allegiance to the United States" describe the status of a Filipino. He is not a citizen of the United States, but he owes allegiance to the United States.

83 Cong.Rec. 2532 (1938).

The fact that Congress on more than one occasion used the phrase "owes allegiance to the United States" to describe the "status of a Filipino" strongly suggests that Congress intended the phrase to describe the relationship between the United States and inhabitants of its territorial possessions, rather than as descriptive of the state of mind required of individual persons. Under this construction, "owes allegiance" would be synonymous with the concept of non–citizen "national", a phrase frequently used to describe the status of non–citizen inhabitants of this country's territorial possessions. *See Rabang v. Boyd, supra.* In the case of a non–citizen, nationality depends primarily upon place of birth, and not upon one's willingness to express loyalty to the United States. *See Oliver v. United States Department of Justice,* 517 F.2d at 427; *Cabebe v. Acheson,* 183 F.2d 795, 797 (9th Cir. 1950).

Plaintiff contends, however, that a "national" is one who owes *permanent* allegiance to the United States, and that if the "owes allegiance" provision was meant to apply only to non–citizen nationals, Congress would have used "permanent allegiance" rather than just "allegiance" when it enacted the exemption from the appropriation act's citizenship requirement. (Plaintiff's Further Memorandum of Law at 21). Plaintiff points specifically to the language of the Nationality Act of 1940, Pub.L. No. 76–853, 54 Stat. 1137 (1940), to support the significance of this distinction. The Nationality Act defines a "national of the United States" as a citizen of the United States or "a person who, though not a citizen . . . owes permanent allegiance to the United States." *Id.* § 101(b); 8 U.S.C. § 1101(a)(22) (1976).

We are not convinced that Congress was so discriminating in its use of these two phrases. Although the Nationality Act, which was apparently the first attempt to statutorily define the term "national", and the "owes allegiance" provision of the appropriations act were both intended to apply to Filipinos, Congress used "permanent allegiance" in one context and "allegiance" in the other. *See Cabebe v. Acheson, supra; Scholz v. Shaughnessy,* 180 F.2d 450 (2nd Cir. 1950). Congress also used "allegiance" in the Tydings–McDuffie Act. In addition, Congress' earlier use of the phrase "owes allegiance" in a 1902 revision to the passport law, Pub.L. No. 57–158, 32 Stat. 386 (1902), indicates that both "allegiance" and "permanent allegiance" have been used exclusively, in the case of non–citizens, to describe the status of inhabitants of United States territories.

Prior to 1902, the passport law authorized the issuance of passports only to citizens of the United States. 35 Cong.Rec. 4993 (1902). As a result of the 1902 amendment, the statute, which has remained in force without further amendment to the present day, provides that:

---

**30.** The act established a ten–year period of gradual reduction of American control. The probationary period was interrupted by Japa-nese occupation during World War II but was completed on July 4, 1946.

No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States. 22 U.S.C. § 212 (1979).

The legislative history of the amendment to the act demonstrates that its purpose was to enable the Secretary of State to issue passports to inhabitants of the territories acquired as a result of the recent war with Spain.[31] The statute was obviously not intended to authorize the issuance of passports to any alien willing to take an oath of allegiance to the United States.[32]

In a letter to the Chairman of the House Committee on Foreign Affairs, included in the Committee's brief but unanimous report on the amendment, Secretary of State John Hay wrote:

SIR: I have the honor to inclose herewith a draft of a proposed amendment to sections 4076, 4078 and 4075 of the Revised Statutes of the United States, which now limit the issuance of passports to citizens of the United States.

Since the treaty of peace with Spain the Department has received applications for passports from residents of the Philippine Islands, Porto Rico, and Guam.

The purpose of the amendment to existing legislation herewith submitted is to secure the sanction of law to the granting of passports to residents of our insular possessions, and thus enable this Government to extend to them a full measure of protection abroad.

H.R.Rep. No. 559, 57th Cong., 1st Sess. 1 (1902); 35 Cong.Rec. 4992.

The Committee concluded its report with the following statement:

The reasons for the necessity for the passage of this bill are so fully set forth in the letter from the Secretary of State that your committee does not deem it necessary to make further suggestions.

Id. at 2. Congressman Hitt, Chairman of the Foreign Affairs Committee, stated:

. . . there is a body or class of persons . . . who owe allegiance to the United States, living in Porto Rico and other insular possessions, to whom it is our duty to afford protection, but who have not yet been decided to be citizens. In the bill presented that protection is authorized to be extended by diplomatic officers granting passports to those owing allegiance to the United States.

35 Cong.Rec. 4993 (1938).

The floor debate following the reading of the Committee's report indicates that the amendment was necessitated in part by the controversy, unresolved at the time, over whether the inhabitants of the newly acquired territories were citizens of the United States. 35 Cong. 4993–4994; 5697–5699 (1902).[33] In the absence of an agreement on that issue, the amendment was explicitly put forth by its backers as an expedient designed solely to facilitate the issuance of passports to those people.

Mr. CLARK. . . . The situation, Mr. Speaker, is simply this: some of us believe that the very minute the Philip-

**31.** According to the amendment's sponsor,

The sole object of the measure is to enable the State Department to issue passports to all the citizens of the United States and those of our recent possessions. . . .

The amendment simply revises the law in that respect and has no other object.

35 Cong.Rec. 5697 (1902) (remarks of Congressman Adams). *See* discussion, *infra.*

**32.** *See* discussion *infra.* Under current State Department regulations, a passport may be issued "only to a national of the United States." 22 C.F.R. § 51.2(a) (1979). A "national" is defined as a citizen or a "noncitizen owing permanent allegiance to the United States." *Id.* § 51.1(d). "United States" is defined as the continental United States, the State of Hawaii,

the Commonwealth of Puerto Rico, the Virgin Islands of the United States, the Canal Zone, American Samoa, Guam and any other islands or territory over which the United States exercises jurisdiction. *Id.* § 51.1(a)

**33.** Some members of the House believed that the language of the amendment clearly implied that inhabitants of the territories were not citizens, while the amendment's backers claimed that the language was deliberately ambivalent. The amendment apparently passed on the assumption that the "owes allegiance" provision was included only to cover such persons if it was ultimately determined that they were not citizens. See discussion *infra.*

pine Islands were annexed to the United States the people of those islands became citizens, as we had it stated here in the debate on the Porto Rican tariff; but there are a great many other people who do not believe anything of the sort, and it was necessary, in the judgment of the State Department and in the judgment of this committee, that some arrangement be made to grant a passport to these people in the Philippine Islands and other islands that are hung up like Mohammed's coffin, between heaven and earth. But in order to avoid that very difficulty of undertaking to decide whether they are citizens or not citizens, we used the language in the second section, which I have read, evading the whole thing.

. . . if you support this bill, you will simply retain your political and constitutional integrity and at the same time allow the State Department to be authorized to issue passports to the Filipinos, whether it shall turn out ultimately that they are American citizens or not; and that is the reason this language is put in there—so that everybody here can vote for the bill and so that if a Filipino wants to go anywhere in the world before it is determined whether he is a citizen or not, he can, somehow or other, get a passport under the provisions of this bill.

35 Cong.Rec. 4993 (1938).

**34.** Congressman Smith stated:

"Now, my criticism upon the language proposed by the committee is that there are different kinds of allegiance owing to the Government. There is what is known as temporary allegiance, as well as that of permanent or unqualified allegiance. There are a great many people in this country who owe temporary allegiance to the United States who are not citizens of the United States. . So that under this bill you propose to authorize the Secretary of State to issue passports to people who are not citizens of the United States and who do not owe permanent allegiance to its Government. So far as I am advised, there is not a government under the shining sun that undertakes to issue passports to people who are not citizens of that government. If you pass this bill, you place your Government in the attitude of authorizing passports to people who owe but

The floor debate also demonstrates that although the act, as finally amended, uses the term "allegiance", the bill originally referred to the committee contained the phrase "permanent allegiance". *See* H.R. 8129, 57th Cong. 1st Sess. (1902); 35 Cong. Rec. 4992 (1902). Some members of the House objected to this change on the ground that it might authorize the State Department to issue passports to aliens who owed only "temporary" allegiance to the United States. 35 Cong.Rec. 5697–5698 (1902) (remarks of Congressman Smith).[34] Congressman Adams, the Foreign Affairs Committee's chief spokesman on the bill, insisted that that was not the Committee's intent and explained that the "allegiance" referred to by the bill was distinct from the allegiance owed to a sovereign by aliens temporarily residing in a country.

Mr. ADAMS. In regard to the objection of the gentleman from Kentucky [Mr. SMITH] I would state that the word "permanent" is only an adjective; that all allegiance is permanent until it is broken by the Government or broken by the citizen. The word "permanent" does not reenforce the fact of allegiance. It is simply an adjective.

. . . . .

Mr. SMITH of Kentucky. If the gentleman will refer to the case of *Radich v. Hutchins* . . . and to the case of *Carlisle v. The United States* . . . he will see that the court says:

temporary allegiance to your Government, because you use merely the expression 'allegiance,' whereas the Secretary of State used the expression 'permanent allegiance.'

"Now, as I said, I would be perfectly willing to accept the proposition of the Secretary of State. I believe that the residents of the Philippine Islands owe permanent allegiance to the Government of the United States, and, believing that, I would be willing to pass a law that would authorize the issue of passports to all persons who owe permanent allegiance to the United States. But you ask me to go further by your amendment; you ask me to vote for a proposition that will authorize the Secretary of State to issue passports to everybody that owes any kind of allegiance to the Government of the United States, and I am unwilling to support that kind of a proposition."

35 Cong.Rec. 5098 (1902).

As a foreigner domiciled in the United States he was bound to obey all the laws of the United States not immediately relating to citizenship and was equally amenable with citizens to the penalties prescribed for their infraction. He owed allegiance to that Government of the country so long as he was therein.

So that there is such a thing as a temporary allegiance.

Mr. ADAMS. Mr. Speaker, passports are not issued to foreigners temporarily residing in any country.

Mr. SMITH of Kentucky. Yes; but you are proposing to pass a law that will authorize it.

. . . . .

Mr. ADAMS. Not at all. The kind of allegiance referred to in that case is what you may call a police allegiance, which simply is imposed on foreigners temporarily residing in any country, that they will be amenable to the laws and do no act that would bring discredit or warfare upon that country.

Mr. SMITH of Kentucky. It is a temporary allegiance.

Mr. ADAMS. That may be, but it is a specified kind, understood in international law between different countries, and has no reference to the allegiance due between the inhabitants of any country and the government thereof.

Mr. SMITH of Kentucky. Let me ask you this question: You authorize the issuing of a passport to anyone who owes allegiance to the United States. Now, does not that cover any kind of allegiance that a person may owe?

Mr. ADAMS. No, sir.

Mr. SMITH of Kentucky. Why does it not?

Mr. ADAMS. Simply because residents and inhabitants of a foreign country are never granted passports in the country in which they temporarily reside.

Mr. SMITH of Kentucky. But if you pass this bill you authorize this Government to do so.

Mr. ADAMS. Then you will fall from the established rule that prevails in all nations of the world.

Mr. SMITH of Kentucky. Now, the gentleman knows that they can not secure passports at all under the law at present.

Mr. ADAMS. And they will not under this law. They are citizens of a foreign country temporarily residing, and they can not be granted passports and can not apply for them.

. . . . .

Mr. SMITH of Kentucky. You say the allegiance referred to in this bill is permanent?

Mr. ADAMS. Yes.

Id. at 5698.[35]

■ We conclude from the legislative history of these various acts that Congress has used "allegiance" and "permanent allegiance" interchangeably and that, as used in these acts, both terms refer exclusively to those people "hung . . . between heaven and earth" in America's overseas possessions. The use of the phrase "owes allegiance" in the appropriation act, as shown by an examination of its own legislative history, is consistent with this general usage. Congress intended to restrict federal employment to citizens and inhabitants of our territorial possessions when it enact-

35. The colloquy continued with the following exchange:

Mr. SMITH of Kentucky. What objection can there be to accepting the proposition of the Secretary of State, and saying "permanent?"

Mr. ADAMS. That is the Secretary's opinion but it adds no force. When this question was before the Committee the provision in this measure that the gentleman from Kentucky refers to was changed in the language of this bill so as to meet expressly the views of gentlemen on that side of the Chamber, and every member of the committee was perfectly satisfied with this bill. It is a unanimous report, and when it was discussed before the arguments in favor of this bill were made entirely by gentlemen on that side of the Chamber, as we thought it was the better way. Now, Mr. Speaker, I call for a vote on the bill.

ed the appropriation acts for 1938, and nothing in the legislative history of subsequent appropriation acts suggests that Congress at any time assigned a different meaning to the "owes allegiance" provision.[36] Finally, the Court notes that neither the Committee Reports nor the floor debates concerning the first adoption of the "affidavit provision" in the Independent Offices Appropriation Act, 1944, Pub.L. No. 78–90, 57 Stat. 169, 196 (1943), sheds any light on the meaning of the term "allegiance". *See* 89 Cong.Rec. 1074–1075; 4786; 4967–4968; 5935–5936 (1943). Insofar as it relates to the "owes allegiance" provision, the affidavit referred to in § 699b and its predecessor acts merely enables a government agency or department to employ a person who claims to be a non–citizen national without conducting an independent inquiry into that person's true status. *See* 89 Cong.Rec. 4967 (remarks of Senator Overton).

██ Ms. Yuen admittedly is not a non–citizen national of the United States. Since

we find that she is not eligible for federal employment under the appropriation act, we turn next to plaintiff's claim that that statute deprives her of equal protection of the law.

### III. *The Equal Protection Issue*

Plaintiff claims that "the distinction made by the Appropriations Act between aliens who can be compensated and aliens who cannot, is unconstitutional" and denies her equal protection of the law. (Memorandum of Law in Support of Issuance of Preliminary Injunction at 6). Apparently arguing that either "strict scrutiny" or some intermediate standard of review applies here,[37] plaintiff contends that "[n]either the face of the statute nor [its] legislative history . . . discloses any 'overriding national interest' which would justify preferring some aliens over others for federal employment on the basis of national origin." (Plaintiff's Further Memorandum of

---

**36.** When the Independent Offices Appropriation Act, 1944, Pub.L. 78 -90, 57 Stat. 169 (1943) was before the Senate in May of 1943, the following colloquy took place.

Mr. GILLETTE. Mr. President, I should like to ask the distinguished Senator in charge of the bill what class of persons is included in the third category-

(3) is a person who owes allegiance to the United States.

What persons, besides citizens and persons who have filed declarations of intention to become citizens, owe allegience to the United States?

Mr. McKELLAR. Section 205 as passed by the House seemed to members of the Senate committee to need clarification. The amendment which the Senate committee added was for the purpose of clarifying the language of the House bill. It did not change it, as we understood it. It appears that no suggestion was made as to the definition of a person who owes allegiance to the United States. I am in doubt about it myself.

This language has been carried in the law for a number of years, and we left it there. I am not sure what it means.

Mr. GILLETTE. I cannot conceive of any person who is not a citizen and who has not filed a declaration of intention to become a citizen, who owes allegiance to the United States.

Mr. McKELLAR. Possibly it refers to a person from the Philippine Islands, the Virgin Islands, or Puerto Rico, who owes allegiance.

Mr. McNARY. Mr. President, I think this amendment comes under the head of controversial amendments, and I ask that it go over.

Mr. McKELLAR. Very well.

The PRESIDING OFFICER (Mr. MAYBANK in the chair). Without objection, the amendment will be passed over.

89 Cong.Rec. 4786 (1943). The amendment referred to is not relevant to this discussion. Although the Senate ultimately passed the bill as amended, 89 Cong.Rec. 4968 (1943), the Court has found no further discussion of the "owes allegiance" provision.

**37.** Initially, plaintiff "acknowledged" that § 699b "must be sustained unless 'wholly irrational,' " but at the same time sought to preserve her right to argue on appeal that a stricter standard of review should apply. (Memorandum of Law in Support of Issuance of a Preliminary Injunction at 7). At the June 16, 1980 oral argument, however, the Court informed plaintiff that such a procedure would be inconsistent with the interest of enabling an appellate court to derive whatever benefit it could from this Court's consideration of the issue. (Trans. at 11–12). Plaintiff now asserts that the "wholly irrational" standard is inapplicable to the facts of this case. (Plaintiff's Further Memorandum of Law at 25–26).

Law at 26). The government, on the other hand, urges that the "wholly irrational"[38] standard applied in *Mathews v. Diaz*, 426 U.S. 67, 83, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), is appropriate here but contends that "under any standard," the interests asserted are sufficient to validate the citizenship requirement challenged in this proceeding. (Memorandum of Law in Opposition To Plaintiff's Motion For A Preliminary Injunction at 12). Although we conclude that an "intermediate" standard of review is appropriate in this case, *see e. g., Petition for Naturalization of Antonio Olegario v. United States*, 629 F.2d 204 (2d Cir. 1980); *Mow Sun Wong v. Hampton*, 435 F.Supp. 37 (N.D.Calif.1977) (*Hampton II*), we hold that the "important" federal interests in providing an incentive for aliens to become naturalized and in providing Congress or the President with the ability to use eligibility for federal employment as a foreign policy tool, are "substantially furthered" by, and are thus sufficient to uphold, the classification scheme established by § 699b.

## A. *The Applicable Standard of Review*

We begin our analysis of plaintiff's equal protection claim with the recognition that although state classifications based on alienage are "inherently suspect" and subject to strict judicial scrutiny, *see e. g., Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *but see, Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), "the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization." *Mathews v. Diaz*, 426 U.S. at 87, 96 S.Ct. at 1895. Plaintiff is of course protected by the Fifth Amendment's implicit guarantee of equal justice under the law. In the context of "selective federal legislation," however, "there may be overriding national interests which justify [such] . . . legislation that would be unacceptable for an individual state." *Hampton I*, 426 U.S. at 100, 96 S.Ct. at 1904. Indeed, as a result of the "paramount federal power over immigration and naturalization", *id.*, courts have consistently applied a more relaxed standard when evaluating federal classifications based on alienage.[39] *See e. g., Mathews v. Diaz, supra*, (applying a "wholly irrational" standard and upholding a federal regulation denying certain Medicare benefits to aliens who had not been admitted for permanent residence in the United States and had not resided here for at least five years); *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) (recognizing the "limited" scope of judicial review and upholding a regulation revoking deferred departure dates previously granted to Iranian nationals); *Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (applying a rational basis standard and upholding a regulation apply-

---

**38.** Although the Court used the phrase "wholly irrational", the standard employed in *Mathews* appears to be the "rational relationship test," which requires that the government demonstrate that the classification involved is rationally related to a legitimate government interest. *See Olegario v. United States, supra*, at 228 · 229.

**39.** The rationale underlying the limited character of judicial review in this context was described in *Mathews v. Diaz*, 426 U.S. at 81 · 82, 96 S.Ct. at 1892 (footnotes omitted):

For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visi-

tors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. . . . The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

ing only to Iranian nationals); *Letourneau v. Califano,* 453 F.Supp. 636 (S.D.N.Y.1978) (3 Judge Court) (applying a "minimum scrutiny" standard and upholding statutes granting certain social security benefits to citizens working for foreign governments or international organizations but not to similarly situated permanent resident aliens), *appeal dismissed,* 444 U.S. 805, 100 S.Ct. 26, 62 L.Ed.2d 18 (1979); *Lopez v. Bergland,* 448 F.Supp. 1279 (N.D.Calif.1978) (3 Judge Court) (applying a rational basis standard and upholding a federal statute limiting eligibility for federal farm operating loans to citizens). *See also, Olegario v. United States, supra,* (applying an intermediate standard and upholding the constitutionality of the withdrawal in 1945 of a naturalization examiner from the Philippines).

█ The exercise of the federal power over immigration and naturalization has thus traditionally been accorded minimum judicial scrutiny. *See Hampton II* at 43. Nevertheless, *Hampton I* at least suggests that something more than mere rationality must be satisfied when federal action deprives an alien of a liberty interest. 426 U.S. at 102–103, 96 S.Ct. at 1904–1905. Although the Court did not explicitly enunciate a standard of review, it noted that

"[W]hen the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. If the agency which promulgates the rule has direct responsibility for fostering or protecting that interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. That presumption would, of course, be fortified by an appropriate statement of reasons identifying the relevant interest. Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption."

*Id.* The Court invalidated the CSC rule because it was neither mandated by the President or Congress nor predicated on any legitimate interest of the Commission,[40] but the Court also assumed without deciding that the "national interest in providing an incentive for aliens to become naturalized, or possibly even [the interest in] . . providing the President with an expendable token for treaty negotiating purposes" would adequately support an explicit determination by Congress or the President to exclude all non–citizens from federal employment. *Id.* at 105, 116, 96 S.Ct. at 1904, 1905.

█ Three months after the decision in *Hampton I,* President Ford issued an Executive Order providing for the exclusion of aliens from the competitive Civil Service, thereby effectively reinstating the prior CSC regulation. Exec.Order No. 11935, 5 C.F.R. § 7.4 (1974). The constitutionality of that order was upheld on remand in *Hampton II* as well as in the face of similar equal protection challenges by alien plaintiffs in *Vergara v. Hampton,* 581 F.2d 1281 (7th Cir. 1978), *cert. denied* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979), and *Ramos v. Civil Service Commission,* 430 F.Supp. 422 (D.P.R.1977) (3 Judge Court). Both *Vergara* and *Ramos* relied heavily on the "assumption" in *Hampton I* and applied what appears to be a mere rationality standard. *Hampton II,* however, rejected mere rationality and held that, after *Hampton I,* "when the federal government seeks to sustain a rule discriminating against noncitizens in a manner which would violate equal protection if adopted by a state, it must demonstrate that the rule substantially furthers important federal interests in the regulation of immigration and naturalization." 435 F.Supp. at 44. The court upheld the Executive Order because it substantially furthers the federal government's "unique" interest in encouraging naturalization in a manner which also furthered the government's interest in the efficiency of the civil

---

**40.** See footnotes 12-13 and accompanying text, *supra.*

service. In *Jalil v. Campbell*, 590 F.2d 1120, 1123 n. 3 (D.C.Cir. 1978), the court explicitly indicated its "general agreement with the reasoning and conclusion" of *Hampton II*.[41] We believe that *Hampton II* articulates the correct standard of review for the equal protection issue in this case.

Like *Hampton I* and in contrast to *Mathews v. Diaz, supra*, the government action challenged here deprives plaintiff and other similarly situated aliens of an interest in liberty. *See Hampton I*, 426 U.S. at 102–103, 96 S.Ct. at 1904–1905 (characterizing ineligibility for employment in a "major sector of the economy" as a deprivation of an interest in liberty); *Hampton II* at 43. The appropriation act's eligibility requirements, moreover, are not directly related to the admission, exclusion or deportation of aliens. Under such circumstances, it is at least arguable that federal classifications affecting aliens should be subjected to some greater degree of judicial scrutiny. *See e. g.*, Rosberg, "The Protection of Aliens From Discriminatory Treatment By The National Government," 1977 Sup.Ct.Rev. 275, 324–336. *But see, e. g., Mathews v. Diaz, supra*. We thus turn to an analysis of the government interests asserted in light of the standards set forth in *Hampton I* and *Hampton II*.

### B. *The Equal Protection Analysis*

 The appropriation act limits eligibility for federal employment to aliens who are citizens of a specified group of foreign countries. The government contends that the statute, particularly the provision exempting nationals of countries "allied with the United States in the current defense effort," provides the President with "a bar-gaining chip . . . in negotiating defense alliances . . . ." (Memorandum of Law In Opposition To Plaintiff's Motion For A Preliminary Injunction at 13). *See also, Hampton I*, 426 U.S. at 105, 96 S.Ct. at 1906. In addition, although not raised by the government, the combination of a citizenship requirement with specific exemptions also provides Congress with an expendable foreign policy token: under the statute, Congress may, as it sees fit, bestow the benefit of eligibility for federal employment upon, for example, citizens of friendly nations, or political refugees. We have little doubt that these foreign policy interests are "unique to the federal government and capable of supporting a degree of federal legislation beyond that permissible to the states." *Hampton II* at 45. Moreover, although there is no clear evidence that Congress acted in furtherance of these interests when it enacted either the citizenship requirement or the specific exemptions, we may "presume that any interest which might rationally be served by the [Congressional] rule did in fact give rise to its adoption." *Hampton I*, 426 U.S. at 103, 96 S.Ct. at 1905. *See also, Olegario v. United States*, supra, at 232. Since it is not our role to question the wisdom of using employment eligibility to serve foreign policy goals, *see Narenji v. Civiletti*, 617 F.2d at 748, the only remaining question is whether the "bargaining chip" or "token" interests are "substantially furthered" by the eligibility scheme set forth in the appropriation act.

The appropriation act in its current form appears as if it was specifically tailored for the "bargaining chip" and "token" interests.[42] More significantly, a rule of law

---

41. In *Jalil*, a naturalized citizen who had challenged the CSC's citizenship requirement while still an alien sought back pay and affirmative hiring relief.

42. Over the years, Congress has exempted specified groups of aliens from the act's citizenship and "owes allegiance" requirements. In 1943, "nationals of those countries allied with the United States in the prosecution of the war" were exempted. Independent Offices Appropriation Act, 1944, Pub.L. No. 78–90, 57 Stat. 169, 196 (1943). This exemption was sub-sequently changed to read "nationals of those countries allied with the United States in the current defense effort." Supplemental Appropriation Act, 1952, Pub.L. No. 82–253, 65 Stat. 736, 755 (1951). Permanently admitted aliens from the Baltic countries were exempted in 1953. Supplemental Appropriation Act, 1954, Pub.L. No. 83-207, 67 Stat. 418, 435 (1953). In 1961, aliens from Poland who were lawfully admitted to the United States for permanent residence were exempted. General Government Matters, Department of Commerce and

qualifying all aliens for federal employment would eliminate the ability of either Congress or the President to utilize eligibility for such employment as a foreign policy tool. *See e. g., Yassini v. Crosland*, 618 F.2d at 1360 ("A rule of law that would inhibit the flexibility of the political branches [in the foreign policy area] should be adopted only with the greatest caution . . .") While Congress could perhaps have adopted a more inclusive classification scheme which would have preserved that ability without excluding plaintiff and similarly situated aliens, we decline to substitute our judgment for Congress' in that regard.

The government also contends that § 699b substantially furthers the federal interest in encouraging naturalization. Within limits, we agree that this interest too is important enough to justify federal action regarding aliens that would be impermissible to the states.[43] *Hampton II*, at 45. *See also, Hampton I*, 426 U.S. at 116, 96 S.Ct. at 1911. We also agree with Chief Judge Peckham's conclusion in *Hampton II* that this interest is substantially furthered by an exclusion from federal employment of aliens eligible for citizenship, but that a blanket exclusion without regard to such eligibility furthers important federal interests only if we consider the interest in administrative efficiency as well as the interest in encouraging naturalization. *Id.* at 45–46. In the context of this case, we note, finally, that Congress' decision, perhaps in furtherance of the foreign policy interests already discussed, to confer a benefit on some aliens/potential citizens but not on others, does not detract from the fact that the statute as drawn substantially furthers the federal interest in encouraging naturalization.

We conclude that the classification scheme established by Congress substantially furthers "sufficiently important" federal interests to satisfy the appropriate constitutional standard of review.[44]

Summary judgment in favor of the defendants is granted.

So ordered.

Related Agencies Appropriation Act, 1962, Pub.L. No. 87-125, 75 Stat. 268, 282 (1961). Cuba was added to the list in 1973. Treasury, Postal Service, and General Government Appropriation Act, 1974, Pub.L. No. 93-143, 87 Stat. 510, 524 (1973). At the request of the State Department, the employment of refugees from South Vietnam was permitted in 1975. Treasury, Postal Service, and General Government Appropriation Act, 1976, Pub.L. No. 94-91, 89 Stat. 441, 458 (1975). Cambodian and Laotian refugees paroled into the United States were exempted in 1978. Treasury, Postal Service, and General Government Appropriations Act, 1979, Pub.L. No. 95-429, 92 Stat. 1001, 1015 (1978). Finally, in 1979, the appropriation act was altered so as not to be applicable to citizens of Israel. Treasury, Postal Service, and General Government Appropriations Act 1980, Pub.L. No. 96-74, 93 Stat. 559, 574 (1979).

43. The kind of action the federal government can take in furtherance of this interest is obviously limited by the due process clause.

44. The government also contends that "the preservation of employment opportunities for American citizens . . . [is] a valid basis for the statute at issue . . ." and that "[a]s significant unemployment continues to prevail in the United States, it is plain that the citizenship requirement for federal employment is not wholly irrational." (Defendant's Supplemental Memorandum at 12). The government has not stressed this point, however, and in view of our finding that the statute is supported by other federal interests, we see no reason to address the question here.